UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DIANA ST. GERARD,

                      **Plaintiff,**

           **-against-**

MERCY MEDICAL CENTER, and CATHOLIC
HEALTH SYSTEM OF LONG ISLAND, INC,
d/b/a CATHOLIC HEALTH SERVICES
OF LONG ISLAND,

                 **Defendants.**
-------------------------------------------------------------------X

Civil Action No:

**COMPLAINT**

Trial by Jury Demanded

      **PLAINTIFF DIANA ST. GERARD** (hereinafter referred to as "Plaintiff"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

**STATEMENT OF THE CASE**

      1.     This is a proceeding to enforce the rights of the Plaintiff and other persons similarly situated, to equal employment opportunities, their rights as employees and their civil rights as citizens of the United States and as New York State residents.  Plaintiff seeks money damages, as well as an injunction restraining Defendants from maintaining a policy, practice, custom and/or usage of:

      a.     Discrimination against Plaintiff and other persons similarly situated because of age, race, color, religion and/or national origin, with respect to compensation, terms, conditions, and privileges of employment, including without intending to limit, hiring, transfer, promotion and pay; and

1

b.      Limiting, segregating and classifying employees of Defendants in ways which deprive Plaintiff and other persons similarly situated of equal employment opportunities and/or otherwise adversely affecting their status as employees because of age, race, color, religion and/or national origin.

2.      Defendants have consistently and/or purposefully and/or negligently deprived Plaintiff and other persons similarly situated of the rights guaranteed to them under Federal and New York State Laws with the intent and design, both directly and indirectly, of fostering a hostile work environment and age, race, color, religion and/or national origin, as well as retaliation, to the detriment of the Plaintiff and other persons similarly situated.

## THE PARTIES

**Plaintiff**

3.      Plaintiff is a female citizen of the United States who currently resides in Lynn Brook, New York.

4.      Plaintiff was born in Haiti in 1949 and was educated in Jamaica, where she learned to speak English.  Plaintiff immigrated to the United States in 1970 and became a citizen in 2012.

5.      Plaintiff was formerly employed by the Defendant Mercy Medical Center (hereinafter referred to as "Defendant Mercy"), a member of Defendant Catholic Health Services of Long Island (hereinafter referred to as "Defendant CHSLI")(Defendant Mercy and Defendant CHSLI shall hereinafter be referred to collectively as "Defendants.")  Plaintiff was employed at Defendants at all relevant times.

6.      At all relevant times, Plaintiff was over forty years of age.

7.      Plaintiff is an employee within the meaning of the N.Y. Exec Law and Title VII.

2

8.      Plaintiff was willing and able to perform her employment duties and obligations and was qualified for the employment position she held at Defendants.

**<u>Defendants</u>**

9.      Upon information and belief, at all times herein, Defendant Mercy has been an entity duly organized and existing under the laws of the State of New York, with more than 100 employees, and with headquarters located at 1000 North Village Avenue, P.O. Box 9024, Rockville Centre, New York 11571-9024. According to its website, Defendant Mercy "is a 375-bed, not-for-profit hospital serving the healthcare needs of Nassau County and its surrounding area, with services ranging from maternal health, oncology and physical medicine to cardiology, rehabilitation, orthopedics, weight-loss surgery and behavioral health."

10.      Upon information and belief, Defendant CHSLI, with a business address of 992 North Village Avenue, Rockville Centre, NY 11570, is an integrated health care system engaged in the operation and management of hospitals and is a healthcare consortium that includes Defendant Mercy.

11.      According to Defendant Mercy's website,    "[Defendant CHSLI], as a ministry of the Catholic Church, continues Christ's healing mission, promotes excellence in care, and commits itself to those in need.  CHSLI affirms the sanctity of life, advocates for the poor and underserved, and serves the common good. It conducts its healthcare practice, business, education and innovation with justice, integrity and respect for the dignity of each person."

12.      Upon information and belief, Defendant Mercy and Defendant CHSLI jointly manage and control Defendant Mercy and as such are alter egos who jointly employed Plaintiff and other health care professionals at Defendant Mercy.    Defendants are jointly Plaintiff's employer.

13.     Defendants were, at all times relevant herein, "employers" within the meaning of 42 U.S.C. § 2000e-(b), as well as the Executive Law of New York State.

## JURISDICTION AND VENUE

14.     This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination of Plaintiff based on, age, race, color, religion and/or national origin as well as Defendants retaliation and wrongful discharge of Plaintiff.

15.     This Court has Jurisdiction over this action under 42 U.S.C.A. § 1981 et. seq., 42 U.S.C.A. § 2000(e) et. seq., 29 U.S.C. § 621 et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).  This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., (the 'Executive Law''), which is known as the Human Rights Law, to redress discrimination with respect to terms and conditions or privileges of employment.

16.     This court has additional supplemental and pendant jurisdiction over the related claims.

## PROCEDURAL REQUIREMENTS

17.     Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and files this action within ninety (90) days of the receipt of a Notice of Right to Sue issued by the EEOC, a copy of which is annexed hereto as Exhibit A.

18.     Plaintiff seeks to recover the attorneys' fees incurred by this lawsuit pursuant to N.Y. Exec Law. §§ 297.

19.     This Complaint is additionally brought pursuant to any other cause of action which can be inferred from the facts set forth herein.

20.     Plaintiff demands a jury trial.

## OPERATIVE FACTS

### Plaintiff's Professional Career and Qualifications

21.     Plaintiff graduated from Hunter Bellevue School of Nursing in 1988 as a Registered Nurse ("RN") with a Bachelor Degree.  She was hired at Flushing Medical Center where she worked as a staff RN on the Medical Surgical Unit.  In 1991, Plaintiff transitioned to home health care so that she could spend more time with her son.  After seven years, she was hired by Mary Immaculate Center in Jamaica, New York, where she was hired as an RN in the mental health unit.  After three and a half years, amidst rumors that Mary Immaculate would be closing, Plaintiff began seeking a new position as a RN in the mental health unit of a hopsital.

22.     Plaintiff was hired by Franklin General Hospital as a part time RN in the mental health unit.

23.     In 2003, she applied for and was hired to do additional RN work in the mental health unit at Defendants.  Later she became a full time RN in the mental health unit at Defendant Mercy.

24.     Plaintiff interviewed with and was hired by then Nurse Manager Paulette Tinton as a per diem Registered Nurse in Mercy's mental health unit (the "Unit).  Nurse Manager Tinton was Jamaican with a dark skin color and a Jamaican accent.  Of approximately twenty-six (26) RNs that worked in the Unit during Plaintiff's employment, only approximately seven (7) were minorities.  Of approximately a dozen physicians whom worked in the Unit during Plaintiff's tenure, only two were minorities, one was forced out after a year and the other worked as a per diem.

25.     The Unit is a locked area that is capable of treating up to 29 mental health patients, many of whom are suffering extremely acute exacerbations of their mental health illness.  The Unit RN daily shifts are: 8 am to 4 pm; 4 pm to 12 am; and 12 pm to 8 am.

26.     When a patient with mental health issues comes to the Mercy Hospital Emergency Room, the ER Staff contacts the Crisis Unit, who assesses the patient, consults with a Psychiatric physician, and if the doctor deems it necessary, refers them for admission to the Unit.

27.     RN duties in the Unit included patient admission, patient education concerning medication administration, disease process, medication side effect, medication compliance and discharge procedures.

28.     Not long after Plaintiff started work, she noticed that the vast majority of Nurses and management were Caucasian.  She also noticed that Nurse Manager Tinton, the only minority supervisor, was not well liked by Caucasian staff members.   Apparently, because she was also a minority, Defendants employees began referring to Plaintiff as "Paulette's Puppet."

29.     Nurse Manager Tinton was soon forced to resign and replaced by Sharon Clare (Nurse Manager Clare"), a Caucasian woman.

30.     Plaintiff was concerned about the lack of minority staff and management, and wondered if the employment decisions were racially motivated, but she was relieved when Nurse Manager Clare hired minority Kimberly Smith as the Assistant Head Nurse for the Evening Shift ("AHN Smith").

31.      However, Nurse Manager Clare received severe backlash for hiring Smith, who was not accepted by the Caucasian staff members, and within one year she was forced to resign.

32.     Meanwhile, RN Allyson Romano was hired out of nursing school as a RN in or about 2008 ("RN Romano").  Plaintiff and AHN Smith helped to train RN Romano, who was not

familiar with psychiatric terminology and was unfamiliar with administrating medication to patients.

**Plaintiff Is Vocal About Disparity of Care Based on Race, National Origin and Religion**

33.    Plaintiff noticed that Caucasian patients and their families were treated more favorably by Defendant Staff in almost every way and that the Unit was much quicker to discharge non-Caucasian patients, while Caucasian patients in far better health condition were not discharged.

34.    Plaintiff also repeatedly noticed unethical and unacceptable treatment against minority patients, including overly physical and unnecessary restraint, dragging of patients, and punishment of patients who did not deserve such treatment.  Caucasian patients were not treated in the same manner.  Caucasian patients were given medication as soon as they asked for it. Minority patients were made to wait or told that they did not need medication.  Caucasian patients were bathed far more often than minority patients. Caucasian patients received toiletries from staff members and were given assistance with their grooming.

35.    In particular, minority patients who did not speak English were discriminated against.  Though staff was required to obtain translators to deal with patients who could not speak English, they often simply ignored them or marked them as "non-compliant" instead of taking the time to communicate with them properly.   Plaintiff complained.

36.    Plaintiff commented about the inequality on several occasions and stated that she wished that Mercy would treat all patients the same way regardless of the color of their skin. AHN Smith also noticed and discussed the disparity of care and tried to fix it.

37.    RN Romano and other Caucasian nurses rolled their eyes and acted annoyed when Plaintiff and AHN Smith pointed out the inequalities in patient treatment.   In response to

7

Plaintiffs objections to the disparate care, RN Romano told Plaintiff that she was a difficult person, that she was never happy and that all she did was complain.  RN Romano repeatedly told Plaintiff to move on and to stop complaining.

38.     Plaintiff noticed that RN Romano was extremely partial to Caucasian patients and very much favored them.  On many occasions, she specifically asked RN Romano if she was showing preferential treatment to certain patients because they were white.   RN Romano ignored Plaintiff's pointed inquiries or responded sarcastically that for all Plaintiff knew the Caucasian patients were "part of [RM Romano's] family."

39.     It was clear that RN Romano disliked Plaintiff and regarded her as a "troublemaker."  It was also clear that she disliked AHN Smith, whom she regularly referred to as "stupid."  RN Romano soon announced to Defendant Staff that she wanted to be the shift Assistant Head Nurse instead of AHN Smith.  Plaintiff was taken aback because RN Romano did not have anywhere near as much experience as AHN Smith and was not as qualified as AHN Smith.  Nor was she as qualified as Plaintiff.   Plaintiff asked RN Romano what made her think that she could get the AHN position.  RN Romano told Plaintiff that she had "a plan."

40.     Soon, RN Romano developed relationships with Defendants Management Staff. Upon information and belief, RN Romano reported to management about all staff members, including Plaintiff.  Upon information and belief, RN Romano advised Defendants' Management that Plaintiff had an issue with the disparity of patient treatment, disparity of employee treatment, and that she complained of racism.

41.     Plaintiff became known as a troublemaker and began to be treated differently than other staff members.  For example, on one occasion, Plaintiff was shockingly suspended for two weeks without pay because her CPR training had expired.   The Unit Secretary had always

advised staff when their CRP training was to expire, but no one had notified Plaintiff.  When other employees CPR training expired, they were simply sent to have CPR training at the hospital.   Upon information and belief, no other employee had ever been suspended for two weeks without pay or otherwise punished for allowing their CPR training to expire-they were simply sent for more training.

**New Management Fosters  A Hostile and Discriminatory Environment**

42.    In or about late 2007 or early 2008, a new position was created for Maureen Mehan as the Mental Health Unit Nurse Director.  Director Mehan was hired to oversee the Nurse Manager, as well as the Assistant Head Nurses, the RNs and the BHAs.

43.    Mehan immediately displayed a preference for young Caucasian nurses, referring to them as "treasures" and noting that Defendants were so happy and lucky to employ them. Mehan showed an obvious lack of interest in, and generally ignored, minority staff members, including AHN Smith.

**Defendants Demote Minority AHN Smith and Promote Less Qualified RN Romano**

44.    Shockingly, Director Mehan soon demoted AHN Smith and promoted RN Romano to the AHN position, even though RN Romano was far less qualified.  AHN Smith had a Bachelor's Degree in Nursing, a Master's Degree in mental health treatment, was licensed to provide private counseling, and had at least 30 years of nursing experience.  Upon information and belief, RN Romano did not have an advanced nursing degree and had only two years of nursing experience.

45.    Former AHN Smith was told she could work as a staff nurse.  Humiliatingly, she was forced to report to new AHN Romano.

**Plaintiff Objects to the Discriminatory Decision and Suffers Severe Retaliation**

46.     Former AHN Smith came to Plaintiff and told her that she had been demoted and that Romano was the new AHN.

47.     Plaintiff was shocked by the bizarre employment decision, which required former AHN Smith and Plaintiff to report to an inexperienced RN that they had helped train, a person who clearly did not like either Plaintiff or former AHN Smith, and who was not very experienced.

48.     Within a few minutes, new AHN Romano walked into the medication room where Plaintiff was standing and smugly announced to Plaintiff and RN Julie Flaminni that she had been promoted to AHN.

49.     Plaintiff responded, "Wow.  I can't believe this, so soon, wow, you weren't joking. Oh my God.  Well, actually, I am not surprised, Mercy always promotes based on skin color and those who kiss up to Defendant Management."

50.     New AHN Romano rolled her eyes at Plaintiff and immediately went to the phone and made a call.  She then left the Unit for approximately 15 minutes with Julie Flaminni. Later, Flaminni apologized to Plaintiff and said that Romano insisted that they had report Plaintiff's comment to Mehan.

**Plaintiff is Written Up in Retaliation for Objecting to the Discriminatory Decision**

51.     Plaintiff was soon called into Mehan's office, to meet with Mehan and Defendants' Director of Human Resource, Ms. Baston.

52.     Mehan stated, "I called you in to discuss something with you because unfortunately I am going to write you up."  Mehan advised Plaintiff that she had heard Plaintiff had made inappropriate comments regarding Romano's promotion.  Plaintiff asked, "What

10

comment?" Mehan responded, "You know what comment you made, do you want me to go over it for you?"  Plaintiff responded, "Yes, I want to hear what you think I said."  Mehan responded, "I am not going to go over this right now.  I already made my decision to write you up."

53.     Though it was obvious that Mehan was aware that Plaintiff had accused Mercy of racial discrimination, Mehan refused to discuss the comment or the accusations of discrimination.  It was clear that neither Mehan, nor Human Resources Director Baston were willing to discuss the demotion decision, nor were they concerned about the lack of minority leadership or questionable employment positions at Mercy.

54.     Mehan stated, "It bothers me that there are two Dianas.  A good Diana, the one that people like, and who does a good job, with excellent documentation, and is a wonderful nurse.  But then there is the bad Diana, the one that is always talking and says all sorts of negative things about the Unit and how it is run.  The Diana who believes that she is on a mission to advocate for everything and everybody and thinks that she should talk for others."

55.     Mehan threatened Plaintiff that if she could not learn to stay out of things that did not concern her she would be fired.

56.     Plaintiff realized that she was being warned to stop discussing the disparate treatment of minority patients and racially discriminatory treatment of minority employees at Defendants if she wanted to keep her job.

**Defendants' Severe Retaliation and Blatant Discrimination Continues**

57.     When Plaintiff returned to the Unit, it was obvious that the other employees no longer felt comfortable associating with her.

11

58.     AHN Romano made it clear to Plaintiff and to other Unit staff that she considered Plaintiff to be an enemy.   AHN Romano immediately engaged in efforts to have Plaintiff terminated.

59.     Plaintiff felt humiliated and hopeless but took her warning seriously and decided to keep her head down until her retirement vested and she could retire.

60.     Knowing that Plaintiff was on thin ice with management, AHN Romano's close friends and allies in the Unit began to incite Plaintiff by subjecting her to constant racism, apparently in the hopes that she would quit, or object to the illegal behavior and be fired for complaining.     Thereafter, Plaintiff was forced to endure years of humiliation and hostility, knowing that she would lose her job if she complained.

**Plaintiff Experiences a Severely Hostile and Discriminatory Environment**

61.     Following the AHN change and Plaintiff's objection that it was a race based decision, the work environment became even more hostile.   Defendants' Employees made insulting, derogatory and discriminatory comments about Plaintiff and other minority employees and patients.   Said comments were routinely made throughout the Unit and in front of members of Defendants Management, patients and doctors.

62.     Plaintiff witnessed other minority employees victimized by discriminatory employment practices.   For example, Martine Lamarre served as the Acting AHN on the night shift, but when she applied for the permanent AHN position, she was told that there was no money available for the position and that Defendants could not fill it.   Defendants closed the job opening and she remained the Acting AHN.   A few months later, without advertising the job opening, Defendants hired a Caucasian woman named Christine Bozak to fill the role.

63.    Claudette Watson, an experienced and well educated Nurse from Jamaica, applied for the long vacant Nurse Manager position.   In response, management discouraged her from applying, and told her that there was "no money" for the role.  Soon however, Pamela Stengel, a Caucasian Nurse, was hired for the role of Nurse Manager (hereinafter "Nurse Manager Stengal").

64.    When minority employee Brittany Grunt tried to change her schedule so that she could complete her schooling, Christine Bozak refused to allow her.  Ultimately she had to go to Human Resources to be approved.  When Caucasian employees requested that their schedule be changed, there was never a problem.

**Plaintiff Experiences Age Discrimination**

65.    Plaintiff also began to experience age discrimination.  Other staff members rhetorically asked her when she was going to retire and Defendant Management actually stated that they were in the process of "getting some young blood."  Shortly thereafter, Defendants hired five nurses out of nursing school and began to terminate senior nurses.  Plaintiff's replacement, a young Caucasian nurse, was hired before her termination.

66.    In particular, a young nurse named Elizabeth Ferro ("RN Ferro") engaged in extremely hostile behavior against Plaintiff and regularly attacked Plaintiff about her age.

67.    RN Ferro would ask Plaintiff when she started dying her hair and ask how much gray she had.  If RN Ferro overheard Plaintiff pause to find a word, she would say, "Awww, are you having another 'Senior Moment?'"   AHN Romano, Nurse Manager Stengel and other members of Defendant Management ignored or joined in on the blatant and hostile age discrimination.

13

**Defendants Ignore RN Ferro's Blatant Discrimination**

68.     RN Ferro also attacked Plaintiff because of her National Origin and Race, in full view of Defendants Management.  She constantly mocked Plaintiff because she was from Haiti and criticized and imitated her accent.

**Defendants Accuse Plaintiff of Practicing Black Magic and Taunts Her With a Voodoo Doll**

69.     RN Ferro constantly asked Plaintiff if she practiced Voodoo, and if she could perform Voodoo magic.  When Plaintiff stated that she was Catholic, not Voodoo, Ferro told her that all Haitians believed in Voodoo.  Plaintiff advised RN Ferro that Voodoo was a religion followed by some Haitians but not all, and that she was offended by her allegations that Voodoo was "black magic" and sinister, because it was an actual religion.  RN Ferro expressed disgust for Voodoo.

70.     RN Ferro began taunting Plaintiff and telling her that she looked like a voodoo doll.  Plaintiff attempted to ignore RN Ferro to the extent she was able and regularly asked her to stop the abusive and offensive behavior, which she carried on in front of management, patients and co-workers.  Thought they were well aware of it, Defendants took no action to stop the hostile environment or the discrimination.

71.     One day, RN Ferro gleefully arrived at work and loudly announced to Plaintiff that she had gone to a flea market and bought a voodoo doll that "looked just like" Plaintiff.  She noted that the voodoo doll had "the same evil eyes" as the Plaintiff and that the only difference between Plaintiff and the voodoo doll was the Plaintiff did not have a needle in the middle of her chest.

72.     The following day, RN Ferro brought the voodoo doll to work and showed it around, swaying it in front of the faces of the other employees and saying "Doesn't this look just like [Plaintiff]?"

73.     When Haiti was struck by an earthquake, Defendants failed to offer counseling to their many Haitian employees, though several employees lost loved ones.  Bizarrely, Defendants Management did not organize a collection or a relief effort of any kind, though they regularly did in other instances and for other reasons.  Instead, staff regularly made comments that the Haitians got what they deserved and that God was punishing them for practicing Voodoo and "Magic."

74.     Despite Plaintiff's constant objections, RN Ferro and other Defendants' employees regularly criticized Haitian patients who were reluctant to take medication.  Instead of attempting to understand the cultural norms concerning medication, or to spend any time discussing the proposed medication with the patient, they would indicate the patient was non-compliant.  Such patients were referred to as being "into Voodoo."

75.     Though other RN's expressed disgust, Defendants Management failed to act. Plaintiff was humiliated and embarrassed.

**Plaintiffs Skin Tone and Hair Texture and Style Are Commented on and Criticized**

76.     RN Ferro also regularly remarked to Plaintiff that Haiti was a poor country full of dark skinned black people and asked Plaintiff why she was so light skinned.  When Plaintiff wore her hair in a braid, RN Ferro would comment on it and say that she was surprised that Plaintiff's hair could be braided because she thought it was "too fine" for a braid.  She repeatedly remarked that she "could have been fooled" while looking Plaintiff up and down.

15

**Defendants Discriminate against the Use of Other Languages and Non-American Accents**

77.     RN Ferro regularly attacked Plaintiff's accent, telling her that she could not understand her and that her accent was "awful" and "not cute."  She also stated that the sound of Haitians speaking English was "irritating" to her ears.

78.     RN Ferro and other Defendant Staff Members mimicked Plaintiff and other Haitian employees and told them that they were impossible to understand.  RN Ferro and other Defendant Staff Members interrupted Plaintiff when she was speaking to Caucasian Patients, and when Plaintiff asked why they had interrupted, they told her it was because the patients could not understand her because of her accent.

79.     Whenever Plaintiff used the word "rest," the other staff members would make fun of her and accuse her of saying "breasts."  Plaintiff was constantly humiliated.

**Defendant Employees Criticize and Discriminate Against Immigrants**

80.     RN Ferro regularly targeted Hispanic patients and stated that all they did was make babies for the taxpayers to take care of.  She repeatedly noted that "immigrants" could not even speak English and said that they should return to their own country if they did not want to learn the language.   Defendants' employees regularly expressed disgust for people who had not achieved citizenship status, which Plaintiff found humiliating as a non-citizen.

81.     RN Ferro also referred to immigrants as ungrateful and said that they should go back to their own countries if they don't like it.  She said that immigrants who refused to learn the language were parasites, and that she "worked [her] butt off so that [immigrants] could get her tax dollars."

82.     RN Ferro and other Defendant employees freely expressed disgust for immigrants and regularly praised anti-immigration efforts, including the actions of a Texas Sheriff who was

16

known for relentlessly pursuing immigrants at the Texas border.   They accused immigrants of stealing American jobs.

83.     RN Ferro would also complain when Hispanic or Haitian patients arrived and regularly muttered things like, "they should not be here getting all of these benefits," "they just make a bunch of children for us to support," and "they should be required to speak English."

84.     Bizarrely, Defendant Management and employees became annoyed and impatient with Plaintiff when she interacted with Spanish, Creole or French speaking patients in their language so that they would understand what was being discussed.  RN Ferro belittled Plaintiff for speaking to patience in Creole, Spanish or French, and told her that immigrants should be forced to learn and to speak English.

**Defendants Employees Chastise Plaintiff's Food Choices**

85.     When Plaintiff ate traditional Haitian food at Mercy, Defendant employees insulted her and taunted her about the food, asking her how she could eat it, and saying that it was too spicy, that there was too much rice, and that it would make her fat.  When she brought in goat for lunch, people made derogatory comments.  She was constantly told that her meals were "too spicy" and that they smelled up the break area.

**The Crisis Staff Refused to Speak to Minority Nurses**

86.     Plaintiff also noted that minority staff members were treated differently than Caucasian staff members by the Crisis Unit.  For example, even when the Crisis Unit was calling to discuss a patient assigned to Plaintiff or another minority nurse, they nonsensically insisted on speaking with RN Ferro or AHN Romano and would only speak to the minority nurses if they had no other choice.  Upon information and belief, the Crisis team was discouraged from speaking to the Minority RNs.

17

**Plaintiff Witnesses Minority Patients Being Discriminated Against**

87.    RN Ferro constantly referred to minority patients as "scumbags' and "douchebags." She also regularly discriminated against minority family members of patients in a humiliating and unprofessional manner.

88.    On one occasion, a mother reported RN Ferro for telling her African American mentally challenged son to "get away from [her] desk and go take a hike on the highway." Upon information and belief, RN Ferro was not disciplined, though Defendants' management was well aware of her discriminatory and racist attitude towards minority patients and employees in general.

**Defendants Favor Caucasian Nurses**

89.    Despite constantly harassing and discriminating against minority staff and patients, RN Ferro was generally favored above all other RNs employed in the Unit and upon information and belief, enjoyed a great friendship with new AHN Romano. RN Ferro was regularly offered extra shifts, allowed to take off whenever she wanted to and trained for positions that she was not qualified for and which were not even posted for other, more qualified minority staff members to apply to.

90.    When the staff grew, RN Ferro was relieved of weekend duty; although such decisions should have gone by seniority. When Plaintiff asked for weekends off, she was regularly denied. When RN Ferro and other Caucasian staff members asked for time off, new AHN Romano would go to great lengths to find coverage or leave the shift short staffed by one person. She did not do the same for Plaintiff.

91.    RN Ferro also enjoyed three part-time shifts at Mercy Hope, Crisis and the 3k Unit, a very favorable situation which no minority nurse enjoyed.

**Defendants Encourage Race Based Patient-Nurse Interactions**

92.     Tension on the floor grew and grew due to the blatant harassment and discrimination.  Defendants promoted a policy of having Caucasian nurses to tend to Caucasian patients and Caucasian families, while non-Caucasian nurses were to tend to and assist non-Caucasian patients and minority families.  Caucasian nurses, including RN Ferro and AHN Romano, would interrupt conversations at the nurses' desk between Caucasian families and non-Caucasian nurses, but the same Caucasian nurses would ignore non-Caucasian family members who came to the nurses' desk to inquire about their family members and wait for a non-Caucasian nurse to speak to them instead.  Plaintiff was pushed aside while trying to help Caucasian family members on several occasions, which left her humiliated and embarrassed.  Both Caucasian and non-Caucasian family members expressed shock by the blatant and discriminatory disrespect.

**Defendants' Establish Pretextual Reasons to Terminate Plaintiff**

93.     After two years of enduring the hostility, abuse and discrimination, Defendants tried to have Plaintiff terminated.

94.     First, Plaintiff was set up and charged with "abandoning the unit."  Plaintiff was absolutely innocent of the charges, and acted in a way that was completely in line with Defendants policy, and yet Nurse Manager Stengal, who knew that the charges were bogus, nonetheless report the incident to Human Resources.  Human Resources failed to investigate and suspended Plaintiff without pay for two weeks.

95.     Humiliatingly, Defendants' Human Resources employee "Ms. Sampson" told Plaintiff that she was the problem and that she had anger issues.  Plaintiff told her that she was angry and frustrated, and noted that no other employees were called into HR for such things.

Plaintiff told Ms. Sampson that she thought she was being treated differently because she was an immigrant from Haiti and because she complained about the way that minority patients were treated.   Ms. Sampson blew up and said, "That is it, I am not going to talk to you anymore.  I am going to send you to employee assistance, and I am going to put you on probation.  If things don't improve by the next time I see you, you will be fired."   Plaintiff was suspended for two weeks without pay.  Plaintiff remained indefinitely on probation until she was terminated.

96.     During her two-week suspension, Plaintiff was forced to report to Defendants' employee Assistance Program where she met with a social worker. Plaintiff advised the social worker that there was a big problem on the floor with disparate treatment amongst patients and that when she pointed it out, instead of fixing the problem, her supervisors acted as though she was the problem and the troublemaker.

97.     Plaintiff told the social worker that she was there for a bogus reason and that the actual reason that she was suspended was because she spoke her mind about unequal treatment of minority patients.   Plaintiff told the social worker that she was being retaliated against for advocating for patients who were being mistreated.

98.     The social worker dismissed Plaintiff's claims about disparity of care and of retaliation and simply told her that she needed to learn to be a team player.

99.     Still, Plaintiff was determined to hit her retirement date, so despite the humiliation and Defendants' refusal to acknowledge or address the disparate treatment minority patients received, Plaintiff returned to work.  Plaintiff continued to excel at work, and received multiple Certificates of Achievement and was certified in Psychiatric and Mental Health Nursing.

100.    Next, Defendants attacked Plaintiff and threatened her job pertaining to her sign-in-sheets although she was filling out her sheets the same way that dozens of other employees,

including Nurse Manager Stengel, were filling out their time sheets.  Upon information and belief however, only Plaintiff was threatened and written up for the incident.

101.    Plaintiff was so distraught over the mistreatment and hostile work environment and so fearful about losing her job that she began to experience severe anxiety and was forced to visit a doctor.  She was diagnosed with extremely high blood pressure and anxiety.  She was put on anti-anxiety medication.

102.    Finally, in or about April of 2012, RN Ferro reported Plaintiff for "failing to complete tasks" while she was serving as the medication nurse during a shift.  The tasks complained of, documenting on three new patients and red-lining the charts, were not tasks that Plaintiff was required to complete.  No other employee had ever been reprimanded for failure to complete such tasks.  In fact, Nurse Manager Stengel had previously, specifically forbidden the medication nurse from handling any other assignment than medication.

103.    Plaintiff confronted Nurse Manager Stengal about the bogus charges and pointed out that she could not have performed the tasks or she would have violated Nurse Manager Stengal's prohibition; Nurse Manager Stengal walked away from Plaintiff and allowed her to be reported to HR for failing to complete the tasks.

104.     Plaintiff was terminated, with the pre-textual reason of "failing to complete an assignment."

105.    In each of the instances of punishment against Plaintiff, Defendants failed to utilize the "Progressive Discipline Policy" set forth in the employee handbook.  Specifically, they failed to provide informal discussion, verbal counseling, or written counseling before the termination.  Nor were any of the alleged offenses (none of which Plaintiff was, in any case, guilty of) fire-able offenses according to the handbook.

106.     Plaintiff has sought work since her termination, but has been unable to find work, due to, upon information and belief, a bad reference from Defendant.

## AS AND FOR A FIRST CAUSE OF ACTION

107.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "106" as if set forth herein.

108.     Plaintiff was over the age of 40 at all relevant times herein, was born in Haiti, is of African descent, and is therefore a member of a protected class under 42 U.S.C. §§ 2000 et seq.

109.     Plaintiff was qualified to work as an employee for Defendants and she satisfactorily performed the duties required by the position she held at Defendant.

110.     Defendants subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's discharge, because of her color, national origin, race and age.

111.     Upon information and belief, Plaintiff's position was filled by a young Caucasian female.

112.     By reason of Defendants' violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

113.     As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A SECOND CAUSE OF ACTION

114.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "113" as if set forth herein.

115.    Plaintiff was born in Haiti, is of African Descent, is over 60 years old, and is therefore a member of a protected class under the New York State Human Rights law.

116.    Plaintiff was illegally discriminated against because of her national origin, race, color and age when Defendant regularly made employment decisions adverse to Plaintiff because of her race, the color of her skin, her national origin and her age.

117.    The race, color, national origin and age discrimination Plaintiff suffered while employed at Defendants was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

118.    The race, color, national origin and age discrimination that Plaintiff suffered while employed at Defendants severely affected the terms and conditions of her employment, as set forth in detail here and above.

119.    Plaintiff repeatedly reported the discrimination to Defendants' management and HR department and it was repeatedly witnessed by Defendants' management and employees. Therefore, Defendants knew or should have known about the discrimination and the effect it had on Plaintiff's employment.  Yet, Defendants failed to take the necessary remedial actions.

120.    As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

121.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

122.    Plaintiff was discriminated against and subjected to race, color, national origin and age discrimination that created a hostile work environment by Defendants based on her race, skin color, and/or national origin in violation of the New York State Human Rights Law.  As a result of Defendants' violation of the New York State Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,500,000.

## AS AND FOR A THIRD CAUSE OF ACTION

123.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "122" as if set forth herein.

124.    Plaintiff became an employee of Defendants in 2003 and as such is protected by the New York State Human Rights Law from retaliation and retaliatory discharge.

125.    Plaintiff repeatedly complained to Defendants and/or Defendants' management regularly witnessed the severe and pervasive race, color, national origin, age discrimination and hostile work environment she was subjected to during her employment with Defendants.

126.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants' managerial and Human Resource employees in violation of New York State Human Rights laws as well as, upon information and belief, Defendants' own internal policies.

127.    Plaintiff notified Defendants' Management of the severe race, color, national origin and age discrimination and hostile work environment she was subjected to and protested the harassment and the fact that Defendants' Management failed to act responsively.

128.    Plaintiff's protest to Defendants about the severe and pervasive race, color, national origin and age discrimination, and hostile work environment she was subjected to during her employment with Defendants was a protected activity under the New York State Human Rights Law.

129.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of age, race and color discrimination and hostile work environment.

130.    Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment.

131.    Because she protested Defendants' unlawful behavior, Plaintiff was constructively terminated.

132.    The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of New York State and City Human Rights Laws.

133.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory constructive discharge.

134.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose

substantial income including, but not limited to wages, social security, and other benefits due her.

135.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

136.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

137.    Plaintiff was discriminated and retaliated against and suffered a retaliatory constructive discharge by Defendants in violation of the New York State Human Rights Law. As a result of Defendants' violation of the New York State Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,500,000.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case no less than $2,500,000;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

(iv)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

**Dated: New York, New York**
       **December 6, 2013**

                                       **NESENOFF & MILTENBERG, LLP**
                                       **Attorneys for Plaintiff**

                                     **By:**_____/s/_____
                                           **Andrew T. Miltenberg, Esq.**
                                         **Megan S. Goddard, Esq.**
                                       **363 Seventh Avenue, Fifth Floor**
                                       **New York, New York 10001**
                                       **(212) 736-4500**